THE PEOPLE *ex rel.* EARL L. VUAGNIAUX *et al.*, Plaintiffs-Appellants, v. THE CITY OF EDWARDSVILLE, Defendant-Appellee.

Fifth District    No. 5—95—0655

Opinion filed October 16, 1996.

Earl L. Vuagniaux, of Earl L. Vuagniaux, P.C., of Edwardsville, for appellants.

Debra J. Meadows, of Reed, Armstrong, Gorman, Coffey, Gilbert & Mudge, P.C., of Edwardsville, for appellee.

JUSTICE MAAG delivered the opinion of the court:

The plaintiffs, the People of the State of Illinois *ex rel.* Earl L. Vuagniaux and Alice G. Vuagniaux, appeal the trial court's grant of summary judgment in favor of defendant, the City of Edwardsville (City).

The relevant facts are as follows. In 1968, the City purchased a parking lot located at Second and St. Louis Streets. This parking lot was used for public parking. In December of 1987, the City's planning department prepared a tax-increment-financing (TIF) redevelopment plan. This plan was revised on January 20, 1988. The City then adopted ordinance No. 4162—3—88 approving the central-area tax-increment redevelopment plan and redevelopment project on March 15, 1988. It is undisputed that the subject parking lot is located within the physical boundaries of the TIF district and is within the redevelopment project area. In May of 1988, ordinance No. 4177—5—88 was passed, authorizing the City's issuance of central-area redevelopment-project-area general obligation bonds in the principal amount of $1,400,000 for the purpose of funding the tax-increment redevelopment plan and project approved by City ordinance No. 4162—3—88 and providing for a tax levy for the payment of said bonds. In July 1988, the redevelopment plan was amended. On July 28, 1988, Garrett A. Balke, Inc. (Korte-Balke), sent a letter to Nina Baird, the City's clerk, stating its development concept. Within its development concept, Korte-Balke stated that it intended to relocate Earl Vuagniaux "to a new building of approximately 10,000 square feet in the City Parking Lot at Second and St. Louis Streets." The letter also requested the City to "[v]acate Second Street between St. Louis and Vandalia [and] [c]onvey to [Korte-Balke] fee simple title to Lot 55 (the City parking lot) for $1.00 and other considerations." The City then passed ordinance No. 4197—8—88 on August 16, 1988, authorizing the transfer of certain real property pursuant to the Tax Increment Allocation Redevelopment Act (Ill. Rev. Stat. 1987, ch. 24, par. 11—74.4—1 et seq. (now see 65 ILCS 5/11—74.4—1 et seq. (West 1994))). This ordinance stated as follows:

"Section II: Prior to the execution and delivery of title instruments, the City, District and the developers shall execute an agreement setting forth the terms upon which the City and the Tax Increment Financing District shall transfer the real estate to the developers and the developer's agreement for development and purchase of the parcels. Said terms shall include, but not be limited to:

A. Purchase price: One Dollar ($1.00) per parcel.
***
C. Developers shall, upon the Second and St. Louis Street parking lot site, construct at least 10,000 square feet of office, retail or compatible general commercial space within two years of said parcel being transferred to developer." Edwardsville, Ill., Ordinance No. 4197—8—88 (1988).

The City then solicited and received proposals for the parking lot in 1989. One of those proposals was submitted by the Vuagniauxes.

In August of 1989, a report on the TIF district was prepared by the City's TIF committee. This report discussed the fact that there had been considerable debate over parking in the downtown area and the fact that the new county administration building was going to worsen the problem. The report stated, *inter alia*, as follows:

"L. *Conversion of Free Parking*

In order to enhance district revenue, the City should consider temporarily transferring title to the Second and St. Louis Street parking lot to the district. The lot could then be upgraded and converted into a leased parking lot. I believe that the market downtown would support $25-50 per month fees for each spot."

On October 12, 1989, Terry Smith, Edwardsville's city planner, prepared a letter to the City's finance committee regarding the "TIF Update" and stated as follows:

"The district should consider the disposal of the parking lot at St. Louis and Second Street. At the present time no official action has been taken ***. I would like to recommend that serious consideration be given to the development of this city owned lot. I am making this recommendation in light of the recent notification of the cancellation of the Michael's Chevrolet redevelopment project. I believe that the development of this lot would greatly enhance the overall financial stability of the TIF district. I believe that the potential financial gains through the development of this lot far exceeds [*sic*] the effects of the loss of 24 public parking spaces. The Council should consider the possibility of making a counteroffer to the offer made by the Vaugniaux [*sic*]/Winfield Partnership. It would be interesting to have their reaction to the city's offer of the City Parking lot *** [at] Second Street for free if they would construct [a] 15,400 square foot building. If this type of an arrangement could be made[,] *** the district would profit by obtaining a greatly increased tax increment as well as the elimination of the existing Vaugniaux [*sic*] building. [The] Vaugniaux[*sic*]/ Winfield Partnership would benefit by obtaining the property at no cost."

Hence, a review of the record shows that the parking lot was a part of the "redevelopment project area" and the "redevelopment plan." See 65 ILCS 5/11—74.4—3(n), (p) (West 1992). The record also shows, however, that the parking lot never became a "redevelopment project." See 65 ILCS 5/11—74.4—3(o) (West 1992). On July 19, 1994, the City passed ordinance No. 4735—7—94. This ordinance authorized a lease of the aforementioned parking lot to Florists' Mutual, one of Edwardsville's largest employers. The ordinance states that

the lease of the parking lot to Florists' Mutual would economically benefit the City's TIF district. According to the ordinance, all of the income generated by the lease of the parking lot was to be deposited into the City's motor fuel tax fund.

On July 21, 1994, the plaintiffs filed a petition for leave to file a complaint in *quo warranto*, alleging that the City failed to comply with certain statutes of the State of Illinois when it leased the aforementioned City parking lot, located 52 feet from the Vuagniauxes' property, to tenants of Mark Twain Plaza, a TIF development. The City filed an answer and motion to dismiss, raising the Vuagniauxes' lack of standing to file a *quo warranto* action. On July 29, 1994, the court determined that plaintiffs had standing, and the court granted plaintiffs leave to file a complaint in *quo warranto* and denied the City's motion, made under section 2—615 of the Code of Civil Procedure (735 ILCS 5/2—615 (West 1992)), to dismiss plaintiffs' complaint due to lack of standing. On September 7, 1994, the plaintiffs filed a motion for leave to file a first amended complaint to add an additional count for injunctive relief. The next day, the court granted this motion. The City filed its answer on December 12, 1994, and its motion for summary judgment on December 15, 1994. In support of its motion, the City filed the affidavits of John Brancaglione, an urban planner employed by a private firm of architects and planners, and Gary Niebur, the City's mayor. On March 23, 1995, the plaintiffs filed a motion for summary judgment. That same day, the plaintiffs also filed a motion to strike the City's two supporting affidavits and deny the City's motion for summary judgment. The court entered an order on May 30, 1995, granting the City's motion for summary judgment, denying plaintiffs' motion to strike the affidavits filed by the City, and denying plaintiffs' motion for summary judgment. In its order, the court stated, "Nothing in the TIF statutes prohibits the City['s] *** leasing of the subject parking lot *** [and] [n]othing in Section [11—]76—1 [of the Illinois Municipal Code (65 ILCS 5/11—76—1 (West 1992))] prohibits the City['s] *** leasing of the subject parking lot." The plaintiffs filed a motion to reconsider, which was denied on July 31, 1995. Plaintiffs then filed a notice of appeal on August 30, 1995.

■ The plaintiffs claim that the City's two affidavits, filed in support of its motion for summary judgment, violated Supreme Court Rule 191 (145 Ill. 2d R. 191) and that they should have been stricken. Pursuant to Supreme Court Rule 191(a) (145 Ill. 2d R. 191(a)):

> "Affidavits in support of *** a motion for summary judgment *** shall be made on the personal knowledge of the affiants; shall set forth with particularity the facts upon which the claim, counter-

claim, or defense is based; shall have attached thereto sworn or certified copies of all papers upon which the affiant relies; shall not consist of conclusions but of facts admissible in evidence; and shall affirmatively show that the affiant, if sworn as a witness, can testify competently thereto."

When reviewing a summary judgment order, the reviewing court should construe the pleadings, depositions, admissions, and affidavits in support of the motion strictly against the moving party and liberally in favor of the opponent. *Rinchich v. Village of Bridgeview*, 235 Ill. App. 3d 614, 627, 601 N.E.2d 1202, 1210-11 (1992). Because summary judgment is a drastic means of disposing of litigation, it should be allowed only when the right of the moving party is clear and free from doubt. *Rinchich*, 235 Ill. App. 3d at 627, 601 N.E.2d at 1211.

In a summary judgment proceeding, the purpose of affidavits is to show whether the issues raised are genuine and whether each party has competent evidence to support his position. *Wiszowaty v. Baumgard*, 257 Ill. App. 3d 812, 819, 629 N.E.2d 624, 630 (1994). An affidavit should meet the same requirements as competent testimony since it actually substitutes for trial testimony. *Wiszowaty*, 257 Ill. App. 3d at 819, 629 N.E.2d at 630. Hence, any evidence that would not be admissible at trial cannot be considered in a summary judgment proceeding. *Wiszowaty*, 257 Ill. App. 3d at 819, 629 N.E.2d at 630.

■ We have reviewed both affidavits, and although we find several statements in Mr. Brancaglione's affidavit and one statement in Mr. Niebur's affidavit to be improper for making legal conclusions, we decline to strike the affidavits in their entirety. Where improper material appears in an affidavit, only the tainted portion should be excised, as opposed to the entire affidavit. *Wiszowaty*, 257 Ill. App. 3d at 820, 629 N.E.2d at 631. Therefore, we can only consider those facts which were properly included in the affidavits. See *Wiszowaty*, 257 Ill. App. 3d at 820, 629 N.E.2d at 631.

■ The plaintiffs claim that the City violated sections 11—74.4—3(n), 11—74.4—4(c), 11—74.4—5(c), and 11—74.4—6(a) of the Tax Increment Allocation Redevelopment Act (the Act) (65 ILCS 5/11—74.4—3(n), 11—74.4—4(c), 11—74.4—5(c), 11—74.4—6(a) (West 1992)) when it leased the aforementioned parking lot to Florists' Mutual. More specifically, the plaintiffs argue that section 11—74.4—4(c) of the Act mandates that the City notify the public and property owners within the TIF district of any redevelopment plan or project and give them the opportunity to bid on the use and/or development of property located within the district. The City argues that even if the property was proposed as part of the plan, if no additional action was taken by the City to adopt a proposal for its *development* as a

redevelopment project, it was not necessary for it to conduct the type of hearing required by the TIF statutes before leasing it. We agree.

We have thoroughly examined the TIF statutes and find that the leasing of the subject parking lot did not violate any of the aforementioned TIF statutes.

The City claims that it was granted the power to enter into the lease with Florists' Mutual pursuant to section 11—76—1 of the Illinois Municipal Code. 65 ILCS 5/11—76—1 (West 1992). Section 11—76—1 states that "[a]ny city or village *** which acquires or holds any real estate for any purpose whatsoever *** has the power to lease the real estate for any term not exceeding 99 years." 65 ILCS 5/11—76—1 (West 1992). Section 11—76—2 (65 ILCS 5/11—76—2 (West 1992)) states, however:

> "Before the corporate authorities of the city *** make a lease of real estate for a term in excess of 20 years, they shall give notice of intent to adopt such an ordinance. The notice must be published at least once in a daily or weekly newspaper published in the city ***, and if there is none, then in some paper published in the county in which the city *** is located. The publication must be not less than 15 nor more than 30 days before the date on which it is proposed to adopt such an ordinance. ***
>
> *** Nothing in this Section prevents the corporate authorities from determining to sell or lease such property to the highest responsible bidder. The corporate authorities may provide by ordinance for the procedure to be followed in securing bids for the sale or lease of the *** property." 65 ILCS 5/11—76—2 (West 1992).

The City argues that "[sections 11—76—1 and 11—76—2] are contradictory in that one requires a bidding procedure and one makes no mention of it." The City claims that because the provisions are contradictory, it should not be required to comply with both. The City argues that only section 11—76—1 applies to this case. We disagree.

Statutes *in pari materia* should be construed together. *People ex rel. Bell v. New York Central R.R. Co.*, 10 Ill. 2d 612, 621, 141 N.E.2d 38, 43 (1957). This is especially true where the statutes were passed the same day and are to take effect the same day. *People ex rel. Funk v. Hagist*, 401 Ill. 536, 541, 82 N.E.2d 621, 623 (1948). Statutes adopted at the same session of the General Assembly ordinarily should be so construed, if possible, as to harmonize (*Funk*, 401 Ill. at 541, 82 N.E.2d at 623) and to give force and effect to the provisions of each. *People ex rel. Little v. Peoria & Eastern Ry. Co.*, 383 Ill. 79, 88, 48 N.E.2d 518, 523 (1943). Two statutes that are passed at the same session of the General Assembly should not be construed as being inconsistent if it

is possible to construe them otherwise. *Little*, 383 Ill. at 88, 48 N.E.2d at 523.

■ Sections 11—76—1 and 11—76—2 were both passed at the same session of the General Assembly on the same day and deal with the same matter. These statutes can be harmonized simply by reading them together, that is, the City may enter into a lease for a term not exceeding 99 years; however, if the duration of the lease is in excess of 20 years, the corporate authorities shall give notice of their intent to adopt such an ordinance. As section 11—76—2 states, the notice must be "published *at least once* in a *** newspaper." (Emphasis added.) 65 ILCS 5/11—76—2 (West 1992). We see nothing inconsistent between these statutes when we give force and effect to the provisions of each of them regarding the duration of a lease and the requirements of publishing notice in a newspaper depending upon the duration of the lease.

On July 19, 1994, the City passed ordinance No. 4735—7—94. This ordinance stated that the City would enter into a lease for a period of less than 99 years with Florists' Mutual on the terms and conditions as provided in the lease attached thereto as exhibit A. The parking space lease agreement, dated that same day, states:

"2. The lease term hereof shall be for a period of five (5) years *** ending on the last day of August, 1999 ***. *** LESSEE shall have the option, in its sole discretion, to extend the term of this Lease for any period that it leases office space in Mark Twain Plaza ***. *** In the event LESSEE purchases office space in Mark Twain Plaza ***, LESSEE may extend the term of this Lease by so notifying LESSOR in writing and this Lease shall thereafter continue until terminated on thirty (30) days['] advance written notice by LESSEE to LESSOR, and in such case LESSOR may not terminate this Lease except upon a material breach of the terms hereof by LESSEE. ***

3. The lease payment (rent) during the term hereof, including any extension or renewal, shall be five dollars ($5.00) per space totaling One Hundred Ten Dollars ($110.00) per month for 22 spaces.

* * *

12. This Lease shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns."

Pursuant to section 2—1005 of the Code of Civil Procedure (735 ILCS 5/2—1005 (West 1992)), the sole function of the court reviewing the trial court's entry of summary judgment is to determine whether the lower court correctly ruled that no genuine issue of fact had been raised and, if none was raised, whether judgment was correctly

entered as a matter of law. *Maxton v. Garegnani*, 255 Ill. App. 3d 291, 294, 627 N.E.2d 723, 726 (1994). We believe that the trial court erred in granting summary judgment in favor of the City in the instant case because the question of the duration of the lease is a mixed question of law and fact that was never resolved by the trial court. It could be argued that the lease was a five-year lease or that it was a lease not exceeding 99 years, since only the lessee can request renewal for up to 99 years. Even the City's brief states, "in examining the terms of the lease no specific period of time is provided." If the court determines after consideration of the evidence and the terms of the lease that the lease is a 99-year lease, then the City has violated section 11—76—2 by not giving notice of its intent to adopt such an ordinance and not complying with the remaining requirements of that section. If the court determines that the lease is a five-year lease, then the City appears to have complied with both sections 11—76—1 and 11—76—2.

Since a mixed question of law and fact remains, namely, the duration of the lease between the City and Florists' Mutual, we must reverse the trial court's order granting summary judgment in favor of the City and remand for further proceedings consistent with this opinion.

■ Finally, we note that the City questions the Vuagniauxes' standing to file a *quo warranto* action. The City apparently made this argument in the event that we reverse the trial court's grant of summary judgment in its favor. As we previously stated, on July 29, 1994, the court determined that plaintiffs had standing, granted plaintiffs' leave to file a complaint in *quo warranto*, and denied the defendant's section 2—615 motion to dismiss (735 ILCS 5/2—615 (West 1992)). The record contains no notice of cross-appeal as required by Supreme Court Rule 303 (155 Ill. 2d R. 303). Ordinarily, when an appellee does not file a cross-appeal, the reviewing court will be confined to the issues presented by the appellant and will not consider issues presented by the appellee, except to the extent that they are related to the appellant's issues. *Simmons v. Union Electric Co.*, 121 Ill. App. 3d 743, 760-61, 460 N.E.2d 28, 40 (1984), *aff'd*, 140 Ill. 2d 444, 473 N.E.2d 946 (1984). This rule, however, does not prevent us from considering the City's assignment of error against the plaintiff. We should be mindful that the City was an entirely successful litigant in the court below, and its claim that the Vuagniauxes do not have standing does not seek the reversal or modification of the judgment as entered in the trial court. This claim is akin to an alternate argument, directed against a possible modification of the judgment by this court, which is precisely what we have done. "We do not see that any

purpose would be served in requiring an appellee to file a cross-appeal in order to preserve conditional arguments against action which may be ordered by this court." *Simmons*, 121 Ill. App. 3d at 761, 460 N.E.2d at 40. Thus, the City's standing argument is properly before us.

The proper standard in determining whether a party has standing is whether the trial court abused its discretion. *Amtech Systems Corp. v. Illinois State Toll Highway Authority*, 264 Ill. App. 3d 1095, 1101, 637 N.E.2d 619, 623 (1994). "Although standing is a component of justiciability [citation], it is not jurisdictional. Rather, the lack of standing is an affirmative defense." *Contract Development Corp. v. Beck*, 255 Ill. App. 3d 660, 664, 627 N.E.2d 760, 764 (1994); see *Greer v. Illinois Housing Development Authority*, 122 Ill. 2d 462, 494, 524 N.E.2d 561, 582 (1988). It is the defendant's burden to show that the plaintiffs do not have standing to sue. The issue is not properly presented in a section 2—615 motion to dismiss because this motion tests whether the complaint is sufficient to state a claim for which relief might be granted. See *Noyola v. Board of Education*, 227 Ill. App. 3d 429, 433, 592 N.E.2d 165, 168 (1992).

We need not decide if the defendant waived this issue by failing to properly raise it as an affirmative defense because the outcome of our decision remains the same—the plaintiffs had standing to file a *quo warranto* action for the following reasons.

In order to maintain an action in *quo warranto*, the Vuagniauxes had to demonstrate that they had a distinct personal interest that was not common to the general public. See *People v. Wood*, 411 Ill. 514, 522, 104 N.E.2d 800, 804 (1952). Further, we recognize that mere allegations of a status as a nearby resident of the subject property and as a taxpayer are insufficient to invoke the trial court's discretion. See *People ex rel. Van Cleave v. Village of Seneca*, 165 Ill. App. 3d 410, 412, 519 N.E.2d 63, 65 (1988). The *quo warranto* complaint alleged the following distinct personal interests of the Vuagniauxes:

"2. *** [T]he Relators were and still are *** owners of fee simple title to commercial real estate in the City, described as *** Lot Numbered *** 220 *** in the *** City ***.

* * *

7. That the City has executed a *Parking Space Lease Agreement*, *** and that the said Lease is of a certain public parking lot, *** *situated fifty-two feet West of the Relators' hereinabove described real estate ***.

8. That public parking is provided for the Relators' hereinabove described real estate by the public parking lot the City proposes to

lease for up to ninety-nine years; and that the termination of the public's use of the said public parking lot for any period of time directly and adversely affects the Relators in a way that is not shared in common with the public at large in that it deprives the Relators of the benefit of a convenient off street public parking lot ***." (Emphasis added.)

Based upon the foregoing allegations in the Vuagniauxes' complaint, we cannot find that the trial court abused its discretion in finding that the Vuagniauxes had standing to file the *quo warranto* complaint. The facts that the Vuagniauxes own commercial real estate located 52 feet from the said public parking lot and that they have alleged that the leasing of this public parking lot has deprived them of convenient off-street parking show that they have a personal interest sufficiently distinct from the general public's interest.

For all of the foregoing reasons, we affirm the trial court's order granting plaintiffs leave to file a complaint in *quo warranto*, we reverse the trial court's order granting summary judgment in favor of the City, and we remand for further proceedings.

Affirmed in part and reversed in part; cause remanded.

HOPKINS, P.J., and GOLDENHERSH, J., concur.